IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TERRY MICHAEL STEVENS,          :
                                :
     Petitioner.                :
                                :
vs.                             :        CIVIL ACTION 12-0606-KD-M
                                :
GARY HETZEL,                    :
                                :
     Respondent.                :


REPORT AND RECOMMENDATION


     This is an action under 28 U.S.C. § 2254 by an Alabama
inmate which was referred for report and recommendation pursuant
to 28 U.S.C. § 636(b)(1)(B), Local Rule 72.2(c)(4), and Rule 8
of the Rules Governing Section 2254 Cases.  This action is now
ready for consideration.  The state record is adequate to
determine Petitioner's claims; no federal evidentiary hearing is
required.  It is recommended that the habeas petition be denied
and that this action be dismissed.  It is further recommended
that any certificate of appealability filed by Petitioner be
denied as he is not entitled to appeal *in forma pauperis*.

     Petitioner was convicted of first degree rape, first degree
sodomy, and first degree sexual abuse in the Circuit Court of
Baldwin County on February 27, 2007 for which he received

1

sentences of twenty-five years, twenty-five years, and seven years, respectively, to run concurrently in the state penitentiary (Doc. 1, p. 2; *cf.* Doc. 12, p. 2).  Appeal was made to the Court of Criminal Appeals of Alabama which affirmed the convictions and sentence (Doc. 12, Exhibit C).  On November 14, 2008, the Alabama Supreme Court denied Stevens's petition for *certiorari* and issued a certificate of judgment (Doc. 12, Exhibit F).

On November 12, 2009, Petitioner filed a State Rule 32 petition (Doc. 12, Exhibit B, Vol. 1, pp. 8-62); on September 10, 2010, that petition was amended (Doc. 12, Exhibit B, Vol. 1, pp. 83-107).  On October 19, 2011, following an evidentiary hearing, the petition and amended petition were denied by the Baldwin County Circuit Court (Doc. 12, Exhibit B, Vol. 1, pp. 138-39).  On April 12, 2012, the Alabama Court of Criminal Appeals remanded the action back for the lower court to enter specific written findings regarding the basis for the denial of certain claims (Doc. 12, Exhibit B, Vol. 2, pp. 7-8).  Those findings were entered on April 27, 2012 (Doc. 12, Exhibit B, Vol. 2, pp. 9-10).  On June 15, 2012, the Alabama Court of Criminal Appeals affirmed the denial of Stevens's Rule 32 petition (Doc. 12, Exhibit G).  On September 14, 2012, following the denial of Stevens's petition for *certiorari* by the Alabama

2

Supreme Court (*see* Doc. 12, p. 10), the Alabama Court of Criminal Appeals issued a certificate of judgment (Doc. 12, Exhibit J).

Petitioner filed a complaint with this Court on September 19, 2012, raising the following claims:  (1) The trial court erred in considering inadmissible evidence as a sentencing factor; (2) there was insufficient evidence to support a verdict of guilt beyond a reasonable doubt; (3) the trial court erred in failing to charge the jury on lesser included offenses; (4) the trial court erred in failing to re-charge the jury on the presumption of innocence and reasonable doubt; (5) trial counsel was ineffective for failing to object to the prosecutor's comments during voir dire; (6) trial counsel was ineffective for failing to make an objection regarding the prosecutor's comments concerning other bad acts; (7) trial counsel was ineffective for failing to preserve for appellate review the issue regarding inadmissible evidence used at Stevens's sentencing hearing; (8) trial counsel was ineffective for failing to ensure that Stevens was present in the courtroom during jury deliberations and when the trial court re-charged the jury; (9) trial counsel was ineffective for failing to prepare and investigate Stevens's case; (10) trial counsel was ineffective for failing to obtain and present exculpatory evidence; (11) trial counsel was

3

ineffective for statements that he made before the jury that implied that Stevens was guilty of something; (12) there was juror misconduct by one of the jurors; (13) one of the prosecutors made an improper comment in the presence of the jurors; and (14) trial counsel was ineffective for advising Stevens not to take a plea offer from the State of ten years, split two to serve (Doc. 1; *cf.* Doc. 12, pp. 11-12).

In answering the Complaint, Respondent has acknowledged that this action was timely filed under the limitation provisions of 28 U.S.C. § 2244(d)(1) of the Anti-Terrorism and Effective Death Penalty Act of 1996 (Doc. 12, p. 12). Respondent goes on to assert, however, that most all of Stevens's claims are procedurally defaulted in this Court because they were not raised in all of the State courts in which he sought relief (Doc. 12, pp. 13-14, 17-23).

A United States Supreme Court decision, *Harris v. Reed*, 489 U.S. 255 (1989), has discussed procedural default and stated that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263, *citing Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985), *quoting Michigan v. Long*, 463 U.S.

4

1032, 1041 (1983).  The Court further notes the decisions of
*Coleman v. Thompson*, 501 U.S. 722 (1991) and *Ylst v. Nunnemaker*,
501 U.S. 797, 803 (1991), which held that a determination by a
state appellate court affirming, without written opinion, a
lower court's reasoned determination that a claimant is barred
procedurally from raising certain claims in that state's courts
satisfied the rule of *Harris*.  The Court will examine each of
Petitioner's claims and the State records to determine whether
its merit should be considered herein.

Petitioner's first claim was that the trial court erred in
considering inadmissible evidence as a sentencing factor.  The
evidence shows that the claim was raised on direct appeal, but
the Alabama Court of Criminal Appeals held that it had not been
objected to at the sentencing hearing so was not properly
preserved for its review (Doc. 12, Exhibit C, p. 25).  The Court
finds that this claim is procedurally defaulted under *Harris*.

Steven's third and fourth claims are that the trial court
erred in failing to charge the jury on lesser included offenses
and in failing to re-charge the jury on the presumption of
innocence and reasonable doubt.  The evidence shows that these
claims were raised on direct appeal and addressed by the Alabama
Court of Criminal Appeals (Doc. 12, Exhibit C, pp. 21-24).
However, Petitioner did not pursue these claims in his petition

5

for *certiorari* before the Alabama Supreme Court (*see* Doc. 12,
Exhibit E, pp. 1-4).  Because Petitioner did not pursue these
claims in a timely fashion before Alabama's highest Court, the
Court finds that they are procedurally defaulted under
*O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) ("[W]e conclude
that state prisoners must give the state courts one full
opportunity to resolve any constitutional issues by invoking one
complete round of the State's established appellate review
process").

　　　Petitioner's fifth, sixth, seventh, eighth, ninth, tenth,
eleventh, and fourteenth claims are, respectively, that his
trial attorney was ineffective in that he:  failed to object to
the prosecutor's comments during voir dire; failed to make an
objection regarding the prosecutor's comments concerning other
bad acts; failed to preserve for appellate review the issue
regarding inadmissible evidence used at Stevens's sentencing
hearing; failed to ensure that Stevens was present in the
courtroom during jury deliberations and when the trial court re-
charged the jury; failed to prepare and investigate Stevens's
case; failed to obtain and present exculpatory evidence; made
statements before the jury that implied that Stevens was guilty
of something; and advised Stevens not to take a plea offer from
the State of ten years, split two to serve.  The evidence

demonstrates that Petitioner raised all of these ineffective assistance claims in his Rule 32 petition (*see* Doc. 12, Exhibit G, pp. 2-3).[1]  The Court notes that claims five, six, seven, eight, eleven, and fourteen were not raised as individual claims in the appeal of the denial of the Rule 32 petition, but were grouped together as a single claim that the lower court had denied Stevens an evidentiary hearing on them (*see* Doc. 12, Exhibit G, p. 4).  The Court finds that these claims were abandoned on appeal and are procedurally defaulted under *O'Sullivan*.  The Court further notes that the Alabama Court of Criminal Appeals found claims nine and ten to be waived because Stevens failed to satisfy the requirements of Ala.R.App.P. 28(a)(10).[2]

---

[1] For the convenience of the reader, the Court will cross-reference the claims raised herein with the claims as discussed by the Alabama Court of Criminal Appeals.  The Court will list the claim number here, followed by the claim number there in parentheses.  The list is as follows:  five (two); six (three); seven (five); eight (four, six); nine (seven); ten (eight); eleven (nine); and fourteen (twelve).

[2] "The brief of the appellant or the petitioner, if a petition for a writ of certiorari is granted and the writ issues, shall comply with the form requirements of Rule 32.  In addition, the brief of the appellant or the petitioner shall contain under appropriate headings and in the order here indicated:  . . . An argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on.  Citations of authority shall comply with the rules of citation in the latest edition of either *The Bluebook:  A Uniform System of Citation* or *ALWD (Association of Legal Writing Directors) Citation Manual:  A Professional System of Citation* or shall otherwise comply with the style and form used in opinions of the Supreme Court of Alabama.

The Court finds that these claims, nine and ten, are procedurally defaulted under *Harris*.

Stevens's twelfth and thirteenth claims, respectively, are that there was juror misconduct by one of the jurors and one of the prosecutors made an improper comment in the presence of the jurors.[3]  The Court notes that these claims, like some of the ineffective assistance of claims discussed earlier, were not raised as individual claims in the appeal of the denial of the Rule 32 petition, but were grouped together as a single claim that the lower court had denied Stevens an evidentiary hearing on them (*see* Doc. 12, Exhibit G, p. 4).  The Court finds that these claims were abandoned on appeal and are procedurally defaulted under *O'Sullivan*.

In summary, the Court has found that claims one, nine, and ten are procedurally defaulted under *Harris*.  The Court has further found that claims three, four, five, six, seven, eight, eleven, twelve, thirteen, and fourteen are procedurally defaulted under *O'Sullivan*.

---

Citations shall reference the specific page number(s) that related to the proposition for which the case is cited."

[3]The Court notes that these correspond to claims ten and eleven, respectively, as discussed by the Alabama Court of Criminal Appeals

8

However, all chance of federal review is not precluded. The Eleventh Circuit Court of Appeals, in addressing the review of these claims, has stated the following:

> Under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) and its progeny, noncompliance with a state procedural rule generally precludes federal habeas corpus review of all claims as to which noncompliance with the procedural rule is an adequate ground under state law to deny review.  If a petitioner can demonstrate both cause for his noncompliance and actual prejudice resulting therefrom, however, a federal court can review his claims.

*Booker v. Wainwright*, 764 F.2d 1371, 1376 (11th Cir.) (citations omitted), *cert. denied*, 474 U.S. 975 (1985).  A claimant can also avoid the procedural default bar if it can be shown that a failure to consider the claims will result in a fundamental miscarriage of justice.  *Engle v. Isaac*, 456 U.S. 107, 135 (1982); *see also Murray v. Carrier*, 477 U.S. 478, 496 (1986).

Stevens has argued that he is actually innocent of the charges against him (Doc. 14).  The U.S. Supreme Court, in *Schlup v. Delo*, 513 U.S. 298, 324 (1995), has stated that, in raising an actual innocence defense to a procedural bar, a petitioner must "support his allegations of constitutional error

---

(*see* Doc. 12, Exhibit G, p. 3).

with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial."  The evidence presented "must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327.  In other words, Petitioner must persuade this Court, "that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329. A court can consider constitutional infirmities only after this threshold has been met.

In this action, the Court notes that Petitioner offers only assertions of his innocence (Doc. 14).  There is no offer of new evidence.  The Court finds that Petitioner has made no showing of actual innocence and has not overcome the procedural default problem presented.  Stevens has demonstrated neither cause nor prejudice for failing to raise these thirteen claims in a timely manner in the State courts.  Furthermore, Petitioner has not shown that this Court's failure to discuss the merit of these thirteen claims will result in a fundamental miscarriage of justice being visited upon him.  Therefore, the Court considers claims one, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, and fourteen in this Court to be

10

procedurally defaulted and the Court will not address their merit.

Petitioner has raised the claim that there was insufficient evidence to support a verdict of guilt beyond a reasonable doubt for his convictions of first degree rape, first degree sodomy, and first degree sexual abuse.  It should be noted that this Court, on habeas review, does not make an independent determination of whether Petitioner is guilty or innocent.  The evidence was constitutionally adequate if there was evidence presented at the trial from which a reasonable trier of fact could find Petitioner guilty beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307 (1979).  This Court further notes that all conflicts in the evidence are resolved in favor of the prosecution.  *Id.* The relevant evidence from trial is as follows.

Teresa Carpenter testified that she and her husband of twenty-two years, Mark Carpenter, have lived in Silverhill for one and one-half years (Doc. 12, Exhibit A, Vol. 1, Tr. 99-107; Vol. 2, Tr. 108-44).[4]  Teresa testified that her daughter, L.C.,[5]

---

[4]The Court will reference all trial transcript testimony by the numbered pages of the transcript itself, rather than to the page numbers assigned by the Court's CMECF system.

[5]"L.C." was the Victim in the charges against Stevens.  Her name is never stated in the trial transcript.  However, the Alabama Court of Criminal Appeals referenced the Victim as L.C. in its memorandum on

was a senior at school where she is very involved in
extracurricular activities.  The Witness has a good relationship
with her daughter although when she was finishing the eighth
grade and starting the ninth grade, L.C. became very defiant,
angry, and disrespectful; formerly, she had been bubbly and very
confident.  At about that time, the Carpenters went on a camping
trip to Birmingham with Mark's sister's family, the Stevens.
Annette is the sister, Terry is Annette's husband, and Joshua,
Ashley, and Teresa are their children.  The families were close
to one another.  On the camping trip, they shared two campers,
with L.C. sleeping with the Stevens.  The morning after camping
out, L.C. got up, crawled into the back of the truck, and
pretended to be asleep without helping put things away which
made Mark really mad.  From that point, L.C. became more angry
and disrespectful.  Teresa's concern led her to search L.C.'s
room for drugs, but she did not find any.  In August, before the
hurricane, a computer search revealed that L.C. had had sex with
her boyfriend, Logan Boswell; the two are still dating.  Teresa
and Mark confided this information to Terry and Annette, seeking
insight from them as they had a daughter several years older
than L.C; the weekend after the hurricane, the Stevens had come
to Summerdale, where the Carpenters were living at the time, to

---

direct appeal (Doc. 12, Exhibit C), so this Court will do the same.

help them clean up.  There was no electricity, but the
Carpenters had a generator, so it was noisy.  That night, Teresa
and Mark slept in their bed downstairs, L.C. slept in her bed
upstairs, and the Stevens slept in a room next to L.C.'s room.
The next morning, L.C. would not come down for breakfast, making
Mark very mad; when she did finally come downstairs, she just
laid on the couch.  From that point, L.C. became even more angry
and she started lying to them; she began to lose weight.  In
January 2005, after her sixteenth birthday, L.C. packed her bags
and threatened to run away, going to a relative's house for
about three days; after she came home, she was diagnosed as
being clinically depressed, was placed on antidepressants, and
began to see a psychologist for six or eight months.  On another
occasion around Mardi Gras, L.C. stayed at the Stevens's house;
about a month later, she declined an opportunity to stay with
the Stevens.  On April 28, 2005, Teresa learned that L.C. had
been raped by her uncle; following that disclosure, L.C. became
a different person, as though a burden had been lifted.  Her bad
behaviors have stopped.

    Valerie Caldwell testified that this was her tenth year as
a teacher and was currently teaching at Robertsdale High School;
she had taught a fitness and wellness health class in 2005 in
which L.C. was a student (Doc. 12, Exhibit A, Vol. 2, Tr. 144-

50).  Caldwell identified the textbook she had used, and in the
Spring of 2005, she was going over a lesson on rape and sexual
abuse and noticed that L.C. seemed distraught; L.C. later asked
if she could go the bathroom and the teacher stepped out of the
classroom with her and walked with her to the office.  L.C. was
very upset and crying at this time.

Karen Sweeny testified that she had been a senior counselor
at Robertsdale High School since 1999; L.C. was not a senior
that year, so Sweeny did not know her (Doc. 12, Exhibit A, Vol.
2, Tr. 150-59).  She remembered, though, that Coach Caldwell had
brought her a student in April 2005 and that she had provided
crisis management for her; she called and made a report to the
Department of Human Resources.  Sweeny also read from a form
completed by L.C., for the Counselor's benefit, at the beginning
of her senior year of high school, August 2006, in which she had
written that she had trust issues, that her grades did not
reflect her abilities because she had gone through a tough time
in her life during which grades and school were not priorities,
and that she had learned that she would not always be praised
for telling the truth, having been abandoned by relatives—though
not her parents—in her time of need.

L.C. testified that she lived in Silverhill and was a
senior at Robertsdale High School; she had lived in Summerdale

until her junior year (Doc. 12, Exhibit A, Vol. 2, Tr. 160-218).
In September 2004, she lived with her parents and was in the
tenth grade.  She identified the Defendant as Terry Stevens, her
Uncle by marriage, and stated that the Stevens family and her
own had been very close.  L.C. stated that at the end of her
eighth grade year, around May 2003, the two families went
camping.  She was lying in bed in the pop-up camper with Josh,
her cousin, watching a movie; she had a headache, so Terry, her
favorite uncle at that time, started rubbing her hand.  Some
time later, Terry extended her arm so that her hand was on his
penis; over and over, he squeezed her hand around it.  He also
began fondling her breast.  L.C. pulled away and rolled over
away from him and stayed there though Stevens tried to pull her
back.  Josh and Annette were also in the camper.  The next time
Terry touched her was during her sophomore year after Hurricane
Ivan at her house, about September 2004; she was fifteen years
old.  The families had all been cleaning up after the storm
during the day.  That night, she went to her own bed, her
parents were in their room downstairs, and Terry and Annette
were in the bedroom next to L.C.'s room.  At some point later,
Terry came into her room, stood next to the bed, and pulled up
her shirt, and started to feel her breasts.  After that, he
began to finger her through her pants; after a while, he pulled

15

the pants down and continued fingering her until the pain became excruciating.  Stevens tried to kiss her, and though she tried, L.C. could not keep him from putting his tongue in her mouth. The whole time he was saying, "Damn it, [].  You know what's going on.  You know what's happening here.  Damn, it [].  Go ahead" (Doc. 12, Exhibit A, Vol. 2, Tr. 173).  After that, her Uncle pulled her head to the edge of the mouth and put his penis in her mouth; he had already taken his pants off.  L.C. tried to roll away, but Stevens grabbed her hips, repositioned her, and put his penis into her vagina.  And then he just stopped, pulled his pants up, said something that she did not hear, and left through the bathroom.  L.C. redressed herself and tried to go to sleep as if nothing had happened.  L.C. testified that she did not call out because she was scared, confused, and did not know what to do.  The next morning, she changed clothes but did not want to go downstairs when her father called her to breakfast. Eventually, she went downstairs, knowing that her dad was agitated, trying to tell herself that it was all a bad dream. The day after the rape, L.C. told her boyfriend about it.  L.C. became concerned, in the weeks following her rape, that she might be pregnant; she was afraid that her family would not believe her if she told them because Stevens had been such a good example of what a dad should be.  L.C. became angry and

mean with her parents, blaming them, for not knowing what was
wrong with her; she lost respect for all adults.  The next time
that Stevens touched her was around Mardi Gras 2005 at his home;
she and her cousin had fallen asleep on adjacent couches in the
den.  The Defendant came up behind the couch she was on, put his
hands under the cover, down her pants and up her shirt, and
began fingering her.  Josh woke up and said something; Stevens
started covering her back up and acting like he was looking for
the remote.  Later that same day, L.C. found herself alone with
Terry and he asked her if everything was ok between them; she
answered as if she did not know what he was talking about,
trying to pretend nothing had happened.  L.C. went on to testify
that she had several opportunities to stay at the Stevens'
house, but declined to do so because Josh was not going to be
there and she wanted to avoid her Uncle.  Coach Caldwell, her
health class teacher, was the first adult she told what had
happened to her.  The lesson that day was about sexual abuse and
rape; L.C. felt like she was reading about herself and started
to break down.  Caldwell excused her to go to the bathroom where
she tried to regain her composure; after L.C. returned to the
class, she started talking to her teacher and told her that she
had been raped and sexually molested by her uncle.  Caldwell
went with her to the office and went to see Ms. Sweeny and told

her story again.  Later that day, she talked to DHR and a
detective, telling them what had happened; L.C. also told them
that she had realized that she had two girl cousins, not
daughters of Terry's, that might be getting abused as well.
L.C. told her parents of the abuse later that week.  After she
was raped, she was diagnosed as having clinical depression and
started taking medication; she began seeing a counselor.  L.C.
first had sex with her boyfriend on April 18, 2004; she
disclosed the rape in April 2005.

Charles Logan Boswell testified that he was eighteen years
old and attended Robertsdale High School; he had gone to school
with L.C. since seventh grade and had been dating her, off and
on, for three years (Doc. 12, Exhibit A, Vol. 2, Tr. 223-29).
Boswell said that he had talked with L.C. about being abused;
she was crying so hard he could barely understand her.

Annette Stevens testified that she had been married to
Terry Stevens for twenty-two years (Doc. 12, Exhibit A, Vol. 2,
Tr. 229-58).  The Witness stated that before the abuse came to
light, she had had an interview with Shannon Whigham with DHR.
Annette testified that her family had taken a camping trip to
Birmingham with the Carpenters in May 2003; Lauren slept in the
camper with the Stevens.  Annette also stated that one night
after a hurricane, she and Terry had slept in the guest room

18

upstairs at the Carpenter house.  The next morning at breakfast, she made the following statement about Terry in front of Mark and Teresa:  "I said it seemed like you peed for an hour when he come back and got in the bed, because he took so long to pee" (Doc. 12, Exhibit A, Vol. 2, Tr. 236).  Annette testified that she could hear Terry urinating in the bathroom the whole time he was gone from the room.

Susan Gross testified that she was a Deputy Sheriff with the Baldwin County Sheriff's Office; in 2005, she worked in the criminal investigations division (Doc. 12, Exhibit A, Vol. 2, Tr. 262-303).  She got involved in this case when she got a call from Ms. Whigham at DHR; the two of them met with Counselor Sweeny and, then, with L.C. who disclosed three different instances of abuse by her Uncle.  Gross testified as to the details as L.C. had divulged them; L.C. was distraught, nervous, and crying as she relayed the abuse.  The next morning, Gross and Whigham told L.C.'s parents what L.C. had told them.  Gross and Whigham met with the Defendant, at the Robertsdale Sheriff's Office, who came in with his wife and son; Gross interviewed Stevens while Whigham talked with Annette and Josh.  The Defendant signed a statement that he was waiving his rights. The Deputy told Terry of the allegations against him, which he denied; he had no explanation for why L.C. would say those

things against him.  Gross noticed that the Defendant, as they talked, started turning red in the face; he clinched his hands, and crossed his arms across his chest.  When he excused himself to go the bathroom, she could hear him sighing very heavily.  As the interview continued, she noticed that his mouth seemed to be getting dry as it was getting more difficult for him to speak. The Deputy testified about the training she had undergone relating to child sex abuse and said that teenagers who have been abused often act out or withdraw; she also stated that teenagers who have been abused often tell a peer first and that it is common for them to wait for months before telling an adult.

Shannon Whigham testified that she was a human resource caseworker with the Department of Human Resources in Baldwin County (Doc. 12, Exhibit A, Vol. 2, Tr. 303-307; Vol. 3, Tr. 308-32).  She got involved in this case following a call from L.C.'s school counselor; she and Deputy Gross went to Robertsdale High School and met L.C. who disclosed three different incidents of sexual behavior by her Uncle.  Whigham testified as to the details of those incidents; L.C. was very hesitant to tell anybody because she did not want to ruin or break up the family, but she was ultimately concerned about her two young girl cousins who were living in the home with her

20

Uncle.  The Caseworker testified that there is usually a change in behavior in a child who has been abused; those behaviors include becoming sexually active, acting out, being aggressive toward their parents, and experiencing problems at school. Whigham testified that it would not be uncommon for someone not to report a rape until a year later, if at all; she also stated that teenagers would more likely disclose to a peer than to an adult.  The State then rested its case (Doc. 1, Exhibit A, Vol. 3, Tr. 333).

The Court notes that Petitioner raised this same claim on direct appeal.  Because the Alabama Court of Criminal Appeals thoroughly explained the law of Alabama with regard to the charges brought against Stevens, this Court will set out a good portion of its analysis herein.

> A person commits the crime of first-degree rape if "[h]e or she engages in sexual intercourse with a member of the opposite sex by forcible compulsion."  § 13A-6-61(a)(1), Ala. Code 1975.  A person commits the crime of first-degree sodomy if "[h]e subjects another person to sexual contact by forcible compulsion."  § 13A-6-66(a)(1), Ala. Code 1975.  Forcible compulsion is defined as "[p]hysical force that overcomes earnest resistance or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person."  § 13A-6-60(8), Ala. Code 1975.

This court has consistently held that the testimony of the victim alone is sufficient to establish a prima facie case of rape, sodomy, or sexual abuse.  See, e.g., Jones v. State, 719 So.2d 249, 255 (Ala. Crim. App. 1996); Pierson v. State, 677 So.2d 830, 832 (Ala. Crim. App. 1996); Matthews v. State, 654 So.2d 66, 67 (Ala. Crim. App. 1994); Edwards v. State, 628 So.2d 1055, 1056 (Ala. Crim. App. 1993); Saffold v. State, 627 So.2d 1107, 1108 (Ala. Crim. App. 1993); and Jones v. State, 580 So.2d 97, 103 (Ala. Crim. App. 1991). Likewise, the testimony of the victim alone is sufficient to establish the element of forcible compulsion.  See Sartin v. State, 615 So.2d 135, 137 (Ala. Crim. App. 1992).

As this court has recognized, forcible compulsion includes not only physical force or violence, but also moral, psychological, or intellectual force used to compel a person to engage in sexual intercourse against that person's will.  See Howell v. State, 626 So.2d 1260 (Ala. 1993). Additionally, the element of forcible compulsion may be established by the relationship of a child victim with the defendant charged with the offense.  See Powe v. State, 597 So.2d 721 (Ala. 1991). Moreover,

> "[i]ssues involving '"consent, force and intent to gratify the sexual desire of either [party]"'' are generally questions for the trier of fact. Parrish v. State, 494 So.2d 705, 709 (Ala. Crim. App. 1985), quoting Hutcherson v. State, 441 So.2d 1048, 1052 (Ala. Crim. App. 1993).  Because the victims in this case were children, the level of physical force and earnest resistance that is necessary to establish forcible compulsion is dependant [sic] upon the totality of the circumstances surrounding the

assault.  See Parrish, supra.  As this
Court noted in Lee v. State, 586 So.2d
264, 266 (Ala. Crim. App. 1991), '[t]he
force required to consummate the crime
. . . is relative, and a different
standard must be applied when, as in
the instant case, the victim is a child
and not a mature woman.'  'Earnest
resistance' is likewise a relative
term, and when determining whether
there was earnest resistance, the
relative strength of the victim and the
defendant, the victim's age, the
victim's physical and mental condition,
and the degree of force employed must
be considered.  See Richards v. State,
475 So.2d 893, 895 (Ala. Crim. App.
1985).  'When the issue of sufficiency
of the evidence is raised in a case in
which the victim is a child, questions
involving resistance and force must be
viewed in the framework of the child's
age and point of view.'  Lee, 586 So.2d
at 266."

C.M. v. State, 889 So.2d 57, 63-64 (Ala.
Crim. App. 2004).

In Ex parte Williford, 931 So.2d 10
(Ala. 2005), aff'd, 931 So.2d 10 (Ala.
2005), the Alabama Supreme Court conducted a
similar analysis as follows:

"The force necessary to sustain a
conviction for first-degree rape or
first-degree sodomy is relative.
Pittman v. State, 460 So.2d 232, 235
(Ala. Crim. App. 1984) ('The force
required to consummate the crime [of
rape] against a mature female is not
the standard for application in a case
in which the alleged victim is a child
thirteen years of age.'), writ quashed,
466 So.2d 951 (Ala. 1985).  '[T]he
"totality of the circumstances" should
be considered in deciding whether there

was sufficient evidence of forcible
compulsion. . . .' <u>Parrish v. State</u>,
494 So.2d at 713.

     "In concluding that the evidence
was sufficient to support a finding of
forcible compulsion, the Court of
Criminal Appeals relied on <u>Parrish v.
State</u>, supra.  In <u>Parrish</u> the evidence
showed that Parrish touched a 12-year-
old girl's 'private parts' while the
child pretended to be asleep on a bed
in Parrish's house.  494 So.2d at 706-
09.  Parrish was the boyfriend of the
child's mother.  The child testified
that Parrish held her down by placing
his foot over her leg and that Parrish
left the bedroom when she pretended to
wake up.  494 So.2d at 707.  There was
blood in the child's panties, and the
Court of Criminal Appeals concluded
there was no evidence of any reason for
the blood 'other than the attack
itself.'  494 So.2d at 711.

     "In affirming Parrish's
conviction, the Court of Criminal
Appeals held that the fact that a 12-
year-old girl makes no effort to resist
a sexual confrontation beyond
pretending to be asleep does not negate
the inference that sufficient legal
force was used to satisfy the element
of forcible compulsion.  494 So.2d at
709.  The Court of Criminal Appeals
also held that when the issue of
sufficiency of the evidence is raised
in a sexual-abuse case, questions
involving resistance and consent must
be viewed '"in the frame of the age of
the assaulted girl."'  494 So.2d at 710
(quoting <u>Smith v. State</u>, 36 Ala. App.
209, 213, 55 So.2d 202, 26 (1951)).
There was no evidence suggesting 'that
the victim requested, encouraged,
consented to or otherwise gave
permission or sanction to, [Parrish's]

24

> actions.'  494 So.2d at 713.  The
> record did not contain any indication
> that Parrish could have entertained, at
> any time, '"any idea or expectation of
> permissive" sexual contact.'  494 So.2d
> at 713.  The Court of Criminal Appeals
> also concluded that there was no reason
> for there to be blood in the child's
> panties, other than Parrish's attack.
> Considering the totality of the
> circumstances, the Court of Criminal
> Appeals concluded that the record
> showed sufficient evidence of forcible
> compulsion to support a conviction of
> first-degree sexual abuse.  494 Sol2d
> at 713.  Therefore, forcible compulsion
> does not exist in a vacuum; rather, it
> is viewed in light of the surrounding
> circumstances, such as the respective
> ages of the victim and the perpetrator,
> the relationship between them, the
> circumstances under which the act took
> place, and any injuries the victim
> suffered."

931 So.2d at 13-14.  Further, as this Court
stated in A.B.T. v. State, 620 So.2d 120
(Ala. Crim. App. 1992):

> "The intent to gratify the desire of
> either party may be inferred by the
> finder of fact from the act itself.
> Houston [v. State, 565 So.2d 1263 (Ala.
> Crim. App. 1990)].  See also Phillips
> v. State, 505 So.2d 1075 (Ala. Cr. App.
> 1986).  Therefore, if the court was
> convinced that the appellant grabbed
> the victim between the legs, then it
> could reasonably and logically infer
> that the appellant had the requisite
> intent necessary to support a
> conviction of sexual abuse."

620 So.2d at 122.

Here, L.C. testified that T.M.S., her uncle, an adult with whom she was in a relationship of trust, see Powe, 597 So.2d at 728, fondled her breasts, put his finger in her vagina, attempted to place his penis in her mouth, which she partially prevented by clenching her teeth, and then inserted his penis into her vagina, and forced her to have sexual intercourse by physically manipulating her body.  According to L.C., all of these events occurred against her will, and although '[T.M.S.] never threatened her," L.C. said "he didn't have to because he scared her so much" and "that the rape itself was sufficient enough as a threat."  (R. 216.)  L.C.'s testimony, alone, was sufficient to establish forcible compulsion under the circumstances in this case.  Likewise, the acts themselves were sufficient to establish that they were done with the intent to gratify T.M.S.'s sexual desire.  Additionally, there was plentiful testimony regarding the resulting physical, mental, and behavioral consequences that L.C. suffered as the result of T.M.S.'s actions.  Therefore, we find that the evidence was more than sufficient to sustain T.M.S.'s convictions.

(Doc. 12, Exhibit C, pp. 15-19).

After reviewing the relevant evidence of record in light of Alabama law concerning the requirements for first degree rape, first degree sodomy, and first degree sexual abuse, the Court finds the evidence was constitutionally adequate to support all three convictions under *Jackson*.  That is, the Court finds that a reasonable trier of fact could find Petitioner guilty beyond a reasonable doubt.  Stevens's claim otherwise is without merit.

Petitioner has raised fourteen different claims in bringing this action. Thirteen of those claims are procedurally defaulted; the fourteenth is without merit. Therefore, it is recommended that this habeas petition be denied, that this action be dismissed, and that judgment be entered in favor of Respondent Gary Hetzel and against Petitioner Terry Michael Stevens.

Furthermore, pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, the undersigned recommends that a certificate of appealability (hereinafter *COA*) in this case be denied. 28 U.S.C. foll. § 2254, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant"). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a COA. 28 U.S.C. § 2253(c)(1). A COA may issue only where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the merits of a claim are reached, a COA should issue only when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where a habeas petition is

27

being denied on procedural grounds, "a COA should issue [only]
when the prisoner shows . . . that jurists of reason would find
it debatable whether the petition states a valid claim of the
denial of a constitutional right and that jurists of reason
would find it debatable whether the district court was correct
in its procedural ruling." *Slack*, 529 U.S. at 484.  As Stevens
did not properly raise thirteen of his claims in a timely manner
throughout the State Courts, a reasonable jurist could not
conclude either that this Court is in error in dismissing the
instant petition or that Petitioner should be allowed to proceed
further.  *Slack* 529 U.S. at 484 ("Where a plain procedural bar
is present and the district court is correct to invoke it to
dispose of the case, a reasonable jurist could not conclude
either that the district court erred in dismissing the petition
or that the petitioner should be allowed to proceed further").
Furthermore, inasmuch as the Court has found that Stevens failed
to assert sufficient facts to support his claim that there was
insufficient evidence to support his convictions, "[t]he
petitioner must demonstrate that reasonable jurists would find
the district court's assessment of the constitutional claim[]
debatable or wrong." *Slack*, 529 U.S. at 484.  It is suggested
that Stevens will not be able to make that showing.

28

## CONCLUSION

It is recommended that Petitioner's petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, be denied. It is further recommended that any certificate of appealability filed by Petitioner be denied as he is not entitled to appeal *in forma pauperis*.

### MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1. **Objection**. Any party who objects to this recommendation or anything in it must, within fourteen days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*). The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within fourteen days after being served with a copy of the recommendation, unless a different time is established by order. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objection party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made. It is insufficient to submit only a copy

of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

Done this 6th day of February, 2013.

s/BERT. W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE